# DAVIS *v.* HORTON.

---

PATENTS; INTERFERENCE; DILIGENCE.

1. Where it conclusively appears in an interference case that the party against whom the rule of diligence is sought to be enforced was in fact the prior inventor, the facts and circumstances surrounding him at the time of his alleged lack of diligence will be carefully considered before he will be deprived of the fruits of his discovery. (Following *Woods* v. *Poor,* 29 App. D. C. 397.)

2. In an interference involving a fuse holder of an enclosed type, between
   original and independent inventors, the junior party, who was the
   first to conceive, was *held* not to be lacking in diligence, when the
   evidence showed that during the three years which preceded the filing
   of his application he conducted experiments in such fuses, everything
   that he did indicating a desire and intention on his part to give to
   the public the benefit of his discovery at the earliest practicable
   moment, and that the senior party did not enter the field until after
   the junior party had fully disclosed his invention to several wit-
   nesses, had demonstrated its entire practicability, and was fully
   aware of its value, and had made arrangements for tools with which
   to manufacture the different parts of fuses embodying his invention,
   and upon the completion of the tools, which was not long after the
   senior party entered the field, had actually constructed fuses fully em-
   bodying the issue, all of which was done without any knowledge on
   his part of the senior party or his invention.

No. 493. Patent Appeals. Submitted May 15, 1908. Decided June 9,
                              1908.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference proceeding.            *Affirmed.*

The facts are stated in the opinion.

*Mr. Wesley G. Carr* for the appellant.

*Mr. Sheldon A. Wood* and *Messrs. Bacon & Milans* for the
appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an interference proceeding, and, as stated by one of
the tribunals of the Patent Office, involves a fuse holder of an
enclosed type, upon the exterior of which is mounted a mechani-
cal indicator consisting of a spring attached to the casing or
cover of the fuse, to show whether or not the fuse has been
blown. The issue is stated in the following counts:

"1. In a fuse holder, a casing, a fuse therein, a spring se-
cured to the exterior of the casing, and a transverse connection

between said spring and the fuse serving to hold the spring in contact with the exterior of the casing while the fuse therein is unbroken.

"2. The combination, with a casing having end terminals and a fusible strip within the casing and connected to the end terminals, of a spring actuated indicator supported exteriorly upon the side of the casing and a wire having its respective ends so attached to the indicator and to an intermediate point in the fusible strip as to exert a lateral strain thereon.

"3. The combination, with a casing or holder having end terminals and an enclosed fuse having its ends attached to the casing terminals, of a spring actuated indicator upon the outside of the casing and a wire that projects through the side of the casing and has its respective ends attached to the indicator and to an intermediate portion of the fuse.

"4. In an enclosed fuse or cut out, a casing having an aperture through its side wall, an internal fuse wire attached at its ends to the casing, an external spring acting finger attached at one end to the casing, and a connection between the opposite end of said finger and fuse wire, passing through said aperture, for holding said finger under tension.

"5. In a fuse holder, a casing, a fuse therein, having a weakened portion, a movable indicator secured to the exterior of the casing, and a connection between the indicator and the weakened portion of the fuse.

"6. In a fuse holder, a casing, a fuse therein having a weakened portion, a spring actuated indicator secured to the exterior of the casing and a transverse connection between the spring actuated indicator and the weakened portion of the fuse."

Harry P. Davis, the senior party, filed January 20, 1904, and alleged conception and disclosure of the invention August 1, 1903, and reduction to practice about the same time. These averments he sustained by competent evidence.

Bryson D. Horton, the junior party, filed August 29, 1904, and alleged conception and disclosure in the spring of 1901, and reduction to practice in the spring of 1903. Counsel for Davis, with commendable candor, states that "both parties to the

interference are original and independent inventors, so far as the records show."

Horton is an electrical engineer, and skilled in the art to which this invention relates. In May, 1901, he was the electrical engineer of the Detroit Copper Mining Company, at Morenci, Arizona. He testifies that along the last of that month he had a great deal of trouble in the blowing out of fuses, particularly in the store of the company, and that where several fuses were located in close proximity with each other it was difficulty to ascertain which particular fuse or fuses had blown; that he thereupon sought to devise, and did in fact devise, a device which he thought would obviate the difficulty; that he disclosed his idea to the company's purchasing agent, a Mr. Puckett, by means of sketches which he then made. Mr. Horton says of these sketches: "I explained them fully to Mr. Puckett, and showed him how the device worked, and how, by attaching a spring fastened to the case and by a wire running from the spring to a cut-away portion of the fuse strip, that the fuse would always burn in two where this weakened portion was, and that when the fuse had burned in two at this weakened portion the spring would be released, and would assume its normal position away from the case, and would provide mechanical means by which I could readily determine whether or not the fuse was blown." In November, 1901, Horton was called to his home, in Michigan, by the illness of his father, who died late in December of that year. Horton administered upon the estate, which occupied his time until the middle of December, 1902, when he went to Detroit, Michigan, and established a plant for the manufacture of enclosed fuses. It was February before he got the factory under operation and made his first delivery of fuses. Soon after establishing his plant he conducted experiments on enclosed fuses embodying the idea which he had disclosed to Puckett at Morenci, in 1901. In April or May he experimented with a device which embodied the dominating idea of the issue, even though technically it differed from it. This device consisted of a fine wire extending through a fuse tube, and attached to the central portion of the fuse element, and so constructed that

when the fuse was ruptured by the burning in two of the fusible element the wire would be released, it being under tension during the operation of the device by a small rubber band, one end of which was fastened to the wire, and the other to a nail driven into the board upon which the fuse block was mounted. Several specimen devices were tested in the presence of witnesses, and the practicability of such indicators fully demonstrated. It appears that the national board of fire underwriters were contemplating the issuance of specifications for standardizing enclosed fuses, and that Horton hesitated about attempting to put his invention upon the market until they had taken action. He did, however, explain a device which fully embodied the issue to one Massnick in July, 1903, and employed Massnick, who was a skilled mechanic, to work upon tools for cutting the fusible element for fuses that could be made to embody the invention. These tools were completed sometime in September, and Massnick on October 1, 1903, became superintendent of Horton's company. Immediately thereafter steps were taken to embody the perfected invention in concrete form, the result being that about the middle of October fuses of a commercial type were successfully tested. In November Horton actually manufactured and sold a small line of these fuses, and in July, 1904, after the board of fire underwriters had issued their rules he manufactured them in large numbers. Mr. Puckett, who is an absolutely disinterested witness, fully corroborates Horton as to what took place in Morenci in 1901, and his testimony is definite and convincing. He was asked on cross-examination whether Horton requested him as purchasing agent to procure any fuses like those Horton had described, and answered: "The matter was discussed, and we wondered if there was anything in the market like it, and we both decided that there was nothing on the market like that, and that if we secured that fuse we would have to make it or have it made." The witness also explained satisfactorily why nothing was then done toward making such a fuse. He further testifies that the sketches Horton made at the time remained on his desk for several days.

Several other witnesses testified in corroboration of Horton,

but we do not deem it necessary to devote more time to the analysis of testimony.

The only question involved in this appeal is whether Horton was sufficiently diligent. In a case like this, where it conclusively appears that the party against whom the rule of diligence is sought to be enforced was in fact the prior inventor, the facts and circumstances surrounding him at the time of his alleged lack of diligence will be carefully considered before he will be deprived of the fruits of his discovery. *Woods* v. *Poor,* 29 App. D. C. 397. As above stated, Horton, soon after the establishment of his plant at Detroit, Michigan, conducted experiments on enclosed fuses, and demonstrated the practicability of the idea which he had disclosed to Puckett in 1901. Everything he did after this demonstration indicates a desire and intention on his part to give to the public the benefit of his discovery at the earliest practicable moment. We do not regard it as at all strange or unusual that he did not proceed with greater haste. Davis did not enter the field until August, 1903, at which time Horton had fully disclosed his invention to several witnesses, had demonstrated its entire practicability, and, being skilled in the art, was fully aware of its value. He had made arrangements for tools with which to manufacture the different parts of fuses embodying his invention, and, as evidence that he was acting in good faith, we find that immediately upon the completion of these tools, which was not long after Davis entered the field, he actually constructed fuses fully embodying the issue. All this occurred at a time when, so far as the record discloses, he knew absolutely nothing of Davis or his invention.

We agree with the tribunals of the Patent Office that Horton was reasonably diligent, and that he is entitled to the award of priority.

The decision of the Commissioner is affirmed, and the clerk of the court will certify this opinion and the proceedings in this court to the Commissioner of Patents, in accordance with law.

*Affirmed.*